*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

BRIDGET LEE BOFYSIL,

           Plaintiff/Counterdefendant-Appellant,

v

SARAH LYNNE BOFYSIL,

           Defendant/Counterplaintiff-Appellee.

FOR PUBLICATION
April 23, 2020
9:05 a.m.

No. 351004
Jackson Circuit Court
LC No. 18-001635-DM

Before: CAVANAGH, P.J., and BECKERING and GLEICHER, JJ.

GLEICHER, J.

A recent Pew Research study reports that in 2016, 18% percent of parents in America stayed home to raise their children. Twenty-seven percent of mothers elected stay-at-home parenting. Livingston, *Stay-At-Home Moms and Dads Account for About One-In-Five U.S. Parents*, FactTank: News in the Numbers, September 24, 2018, available at <https://www.pewresearch.org/fact-tank/2018/09/24/stay-at-home-moms-and-dads-account-for-about-one-in-five-u-s-parents/> (accessed April 10, 2020). For one parent to stay home to raise the children, the other must go out into the world and generate an income to support the family. Does working outside the home compromise a parent's ability to forge and maintain a strong, healthy relationship with her children? What if both parents work outside the home? Is the child essentially without a parent truly committed to parenting and all that the job entails?

In this case, the trial court found that the young child had an established custodial environment only with defendant Sarah Bofysil, largely because Sarah "was the stay at home mom while the parties were together" and the child "is with her the majority of the time." It was error to discount the role of the child's other parent, plaintiff Bridget Bofysil, simply because Bridget worked outside the home to support her family. This error influenced the applicable burden of proof and permeated the court's assessment of the child's best interests. Accordingly, we affirm in part the judgment of divorce, but vacate the custody award and remand for further proceedings.

## I. BACKGROUND

Bridget and Sarah married in April 2014. The couple decided to have a child, using Bridget's egg fertilized with a sperm donor and implanted in Sarah. Bridget and Sarah agreed that

-1-

Sarah would stay home to raise their child for an unspecified period of time while Bridget would continue to work outside the home as a canine officer with the Eastern Michigan University Police Department. Sarah stopped working in December 2015, and the couple's daughter, AB, was born in January 2016.

Bridget and Sarah's relationship began to deteriorate after AB's birth. Money was tight and Bridget claimed that Sarah rejected Bridget's requests that she return to work. Sarah, on the other hand, accused Bridget of belittling her role as a stay-at-home parent. Bridget worked overtime when possible and was sometimes required to travel for work events. Bridget's absence put a strain on the relationship. Eventually, the couple's arguments, suspicions, and verbal mistreatment of each other took its toll and Bridget filed for divorce in June 2018.

Bridget testified that during their marriage, both she and Sarah served as "primary caretaker[s]" for AB. Bridget asserted that she "picked [her] shift at work to make it so that [she] could have the most amount of hours with [AB] during the day as possible." Bridget described:

> I was there everyday when [AB] woke up. I was there for lunch. I was there to take her to do fun things like go to the park, go run around the mall. We went to family outings together. We did bath time together as much as possible. Every day I was home that I had off I put her to bed. I read her stories. I brushed her hair. I painted her nails. I did everything that a parent does with a child. Cooked meals, tried to get her to try new things. Everything.

Sarah described the family situation somewhat similarly. As Bridget worked the night shift, she was still asleep when AB awoke at 7:30 a.m. Sarah asserted that she fed AB breakfast and played with her until Bridget got up at 11. Sarah continued:

> At that point in time, we would spend some family time together. One of us would make lunch. It was typically Bridget because she enjoys to cook more than I do, and I would continue playing with [AB], getting her dressed, um, just everyday activities . . . for a toddler. We would have lunch together.

Sarah testified that Bridget took side jobs as a dog trainer some afternoons. Those jobs sometimes "interrupted" family time after lunch. On other occasions, Sarah assisted and AB went with them. Around 4 p.m. during the week, Bridget would prepare for work. Sarah described that Bridget would go into the bedroom alone for 45 minutes to one hour to "get into warrior mode," enabling her to move from family time to a police mindset. Bridget denied ever using this term. When Bridget left for work, she would flash the lights on her cruiser and sound the siren to say goodbye to AB.

When Sarah left the marital home, she took AB and moved in with her parents in Montague. Once the marital home sold, Bridget moved to Redford Township, more than two hours away from Sarah and AB. Bridget asserted that she could not move closer to Sarah's new home because she continued to work in Ypsilanti. And Sarah asserted that as she was unemployed, moving to the Muskegon area with her parents was her only option. Moreover, Sarah expressed her intent to continue living with her parents and to remain unemployed indefinitely in order to maintain consistency for AB.

Bridget testified that Sarah kept AB from her for an entire month following their separation and thereafter allowed her to take AB for just two days every other week. Sarah would allow Bridget to take AB only when Bridget was off work. However, when Bridget suggested using vacation time to spend more time with AB, Sarah refused. Bridget accused Sarah of arranging parenting-time schedules that conflicted with Bridget's work schedule and of being inflexible. Ultimately, following a conciliation meeting, the parties received a definitive parenting-time schedule from the Friend of the Court.

Sarah testified that AB spent "the majority of her time" with her since the separation. She explained that Bridget had parenting time three weekends each month from Saturday evening through Tuesday afternoon. Sarah wished to change that schedule from Friday evening to Monday afternoon to allow AB an additional day to attend preschool. Sarah accused Bridget of denying her requests to Facetime AB during parenting time. And Sarah testified that Bridget had specifically refused to coparent, instead preferring to "parallel parent" with Sarah, exchanging communication about AB in a notebook. Sarah conceded that shortly after the separation, she denied parenting time to Bridget for approximately one month because Sarah required "a written communication between our two lawyers." Sarah testified that she insisted on this type of confirmation before the entry of the FOC order because Bridget sent her an email "saying that she would be keeping [AB] for an additional week."

Ultimately, the court awarded sole legal and physical custody of AB to Sarah, with "reasonable rights parenting time" to Bridget. The court began by finding that AB's established custodial environment was with Sarah alone. In this regard, the court reasoned:

> [Sarah] was the stay at home mom while the parties were together and she had primary physical custody continuously since they separated. [AB] naturally looks currently to the parent she is with for love, affection and the necessities of life. Since that parent is usually [Sarah], as she is with her the majority of the time, the Court finds an established custodial environment exists with [Sarah].

The court held Sarah to "a preponderance of the evidence" standard to prove that it was in AB's best interests to award her sole physical custody while granting Bridget only "reasonable rights parenting time," but required Bridget to prove by clear and convincing evidence that she should have physical custody of AB. However, the court couched, even if it

> were to find that an established custodial environment exists with both parties, changing primary physical custody to [Bridget], as she requests, would destroy the established custodial environment with [Sarah], whereas, reducing [Bridget's] parenting time from three weekends per month to two is not such a drastic change that it would destroy the established custodial environment with [Bridget], and could be ordered even if only a preponderance of evidence supports the change. However, regardless of which standard applies, the Court finds that the evidence supporting the following custody determination is indeed clear and convincing.

The court then addressed legal custody. Throughout the proceedings, the parties had shared joint legal custody. The court noted that the parties could not cooperate or agree on important life decisions. The court faulted Bridget for refusing Sara's "numerous attempts . . . to engage [her]

-3-

in joint parenting" and for her insistence on parenting "independently in parallel, instead of in cooperation." The court further determined that Bridget had employed "harsh and abusive communications" that "demonstrated that she is incapable of co-parenting." Accordingly, the court awarded Sarah sole legal custody of AB.

The court continued to consider the best-interest factors of MCL 722.23, weighing most in favor of Sarah. In this analysis, the court expressed a decided preference for Sarah as the stay-at-home caretaker. In finding that factor (a), "[t]he love, affection, and other emotional ties existing between the parties involved and the child," favored Sarah, the court found that Sarah "has closer parental and emotional ties to [AB] than does [Bridget] by virtue of being able to spend significantly more time with her." The court further found that Sarah's "commitment to remain home with the child until she reaches school age, rather than place her in day care or the care of another, will enable [Sarah] to be far better able to provide [AB] with love, affection and guidance than [Bridget], who spends much of her days at work," tipping the scales in Sarah's favor under factor (b), "[t]he capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any." And in analyzing "[t]he length of time the child has lived in a stable, satisfactory environment" under factor (d), the court noted that "[a]lthough both parties have been involved in the care of the child, . . . [Sarah] has been the primary caregiver."

Bridget subsequently filed a motion for reconsideration, arguing in part that the evidence established that AB had resided primarily with Sarah since the separation only because Sarah had withheld and alienated AB from her. Bridget further asserted that the court awarded Sarah "primary physical custody largely because the Court assumed that [Bridget] would be forced to use third party child care givers because of her employment." Bridget contended that this assumption was erroneous and asked the court "to reopen the proofs" to allow her to "present additional evidence as to her work schedule and to prove that [Sarah] plans to enroll the minor child in unnecessary pre-school although [Sarah] is still unemployed." The court denied the motion.

Bridget now appeals.

## II. STANDARDS OF REVIEW

"All custody orders must be affirmed on appeal unless the trial court committed a palpable abuse of discretion, made findings against the great weight of the evidence, or made a clear legal error." *Mitchell v Mitchell*, 296 Mich App 513, 517; 823 NW2d 153 (2012). "The great weight of the evidence standard applies to all findings of fact. A trial court's findings . . . should be affirmed unless the evidence clearly preponderates in the opposite direction." *Phillips v Jordan*, 241 Mich App 17, 20; 614 NW2d 183 (2000). Further, the "abuse of discretion standard applies to the trial court's discretionary rulings such as custody decisions." *Id*. Finally, this Court reviews questions of law for clear legal error. *Id*. "A trial court commits clear legal error when it incorrectly chooses, interprets, or applies the law." *Id*.

## III. ESTABLISHED CUSTODIAL ENVIRONMENT

Before making a custody determination, the trial court must determine whether the child has an established custodial environment with one or both parents, *Kessler v Kessler*, 295 Mich App 54, 61; 811 NW2d 39 (2011), which "is an intense factual inquiry." *Foskett v Foskett*, 247 Mich App 1, 6; 634 NW2d 363 (2001). An established custodial environment is one

> of significant duration in which a parent provides care, discipline, love, guidance, and attention that is appropriate to the age and individual needs of the child. It is both a physical and psychological environment that fosters a relationship between custodian and child and is marked by security, stability, and permanence. [*Berger v Berger*, 277 Mich App 700, 706; 747 NW2d 336 (2008).]

"An established custodial environment may exist with both parents where a child looks to both . . . for guidance, discipline, the necessities of life, and parental comfort." *Id*. at 707.

Determining a child's established custodial environment is a pivotal step in a custody battle because it installs the burden of proof. If a proposed change would modify the child's established custodial environment, the proponent must demonstrate by clear and convincing evidence that the proposed change is in the child's best interests. *Pierron v Pierron*, 486 Mich 81, 92; 782 NW2d 480 (2010). If the proposed change would not modify the established custodial environment, the proponent need only demonstrate by a preponderance of the evidence that the proposed change is in the child's best interests. *Id*. at 92-93. If a child has an established custodial environment with both parents, neither parent's custody may be disrupted absent clear and convincing evidence that the change is in the child's best interests. *Powery v Wells*, 278 Mich App 526, 529; 752 NW2d 47 (2008).

Here, the court determined that AB had an established custodial environment exclusively with Sarah. Therefore, Sarah was only required to establish by a preponderance of the evidence that granting her sole physical custody was in AB's best interests, and Bridget had to prove by clear and convincing evidence that granting her sole physical custody would be best for her child. Left unsaid was that Bridget would have to prove by clear and convincing evidence that even shared custody would serve AB's best interests.

The evidence preponderates against the circuit court's established-custodial-environment finding. Both parties agreed that from AB's January 2016 birth until Sarah left the home with AB in the middle of June 2018, both parents shared in the care of AB. Although Bridget worked outside of the home, she arranged her schedule to maximize her time home during AB's waking hours. Even Sarah conceded the Bridget was usually the one to make lunch for the family and that the whole family often would be present when Bridget took on side jobs training dogs. AB clearly had a homelife in which both of her parents provided for her care and needs. Although AB may have looked to her parents to fulfill different needs and likely understood at some level their distinct household roles, both provided her with "security, stability, and permanence."

The circuit court apparently contemplated that its established-custodial-environment determination might not withstand appellate scrutiny. The court noted, "regardless of which standard applies, the Court finds that the evidence supporting the following custody determination

is indeed clear and convincing." However, the court perpetuated its erroneous approach to the working parent throughout the judgment, faulting Bridget for her full-time employment outside the home by treating her as less than a full parent.

## IV. BEST INTEREST FACTORS

A trial court must consider the factors outlined in MCL 722.23 in determining a custody arrangement in the best interests of the children involved. The statute provides:

> As used in this act, "best interests of the child" means the sum total of the following factors to be considered, evaluated, and determined by the court:
>
> (a) The love, affection, and other emotional ties existing between the parties involved and the child.
>
> (b) The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any.
>
> (c) The capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs.
>
> (d) The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.
>
> (e) The permanence, as a family unit, of the existing or proposed custodial home or homes.
>
> (f) The moral fitness of the parties involved.
>
> (g) The mental and physical health of the parties involved.
>
> (h) The home, school, and community record of the child.
>
> (i) The reasonable preference of the child, if the court considers the child to be of sufficient age to express preference.
>
> (j) The willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents. A court may not consider negatively for the purposes of this factor any reasonable action taken by a parent to protect a child or that parent from sexual assault or domestic violence by the child's other parent.
>
> (k) Domestic violence, regardless of whether the violence was directed against or witnessed by the child.

(*l*) Any other factor considered by the court to be relevant to a particular child custody dispute.

"A trial court's findings regarding each best interests factor are reviewed under the great weight of the evidence standard." *McIntosh v McIntosh*, 282 Mich App 471, 475; 768 NW2d 325 (2009). And just as when determining AB's established custodial environment, the court's findings on many factors preponderated against evidence that Bridget was regularly and routinely involved in AB's daily care despite that she worked outside the home.

The court erroneously weighed factor (a) in Sarah's favor after finding that Sarah "has closer parental and emotional ties to [AB] than does [Bridget] by virtue of being able to spend significantly more time with her." The court similarly erred in weighing factor (b) in Sarah's favor based on its conclusion that Sarah "has been the primary caregiver and that her commitment to remain home with the child until she reaches school age, rather than place her in day care or the care of another, will enable her to be far better able to provide her with love, affection and guidance than [Bridget], who spends much of her days at work." The fact that the parties agreed before conceiving that one parent would stay at home to raise the child while the other would financially support the family does not equate with one parent loving the child more or having more affection for the child. Nor should that decision foreclose the result of a custodial disagreement if a relationship ends.

Despite treating Bridget as a less viable parent because she chose to work outside the home, the court declined to credit Bridget for her ability and willingness to earn an income and provide health insurance for her child. The court treated the parties equally under factor (c) after deeming child support and "the additional support [Sarah] receives from her family" as "more than sufficient to meet [AB's] material needs." We discern no rational reason to both punish and yet fail to credit a parent for financially supporting his or her family.

The court also erred throughout its best-interest analysis by focusing heavily on Bridget's new romantic relationship. The parties presented evidence that since the separation, Bridget had moved on romantically while Sarah had not. In focusing on this factor, the court repeatedly emphasized that Bridget was not yet divorced and her new girlfriend was married, although separated. The court described this relationship as "illicit," expressed that it took "a very dim view of extra-marital relationships" because they "show[] a lack of candor and fidelity," and implied that Sarah therefore had a superior moral character.

Michigan courts have repeatedly held that infidelity cannot be used to measure a parent's moral fitness under MCL 722.23(f) unless that infidelity actually interferes with the parent's ability to parent his or her child. See *Fletcher v Fletcher*, 447 Mich 871, 886-887; 526 NW2d 889 (1994); *Berger*, 277 Mich App at 712-713. The court in this case did not consider Bridget's relationship with a married woman before her divorce was finalized in analyzing factor (f). However, it made those exact same judgments in analyzing factors (d) and (e). This was improper under any factor. See *Fletcher*, 447 Mich at 886-887 ("Factor f (moral fitness), like all the other statutory factors, relates to a person's fitness *as a parent*."). Moreover, the circuit court treated the parties disparately. The evidence established that Sarah was married when she began her romantic relationship with Bridget. Surely that "illicit relationship" equally "shows a lack of candor and fidelity" on Sarah's part.

Bridget also challenges the circuit court's analysis of factor (j)—willingness to foster the other parent's continuing parent-child relationship. The court commenced its analysis by committing a factual error: "the undisputed testimony of both parents indicated that even in the absence of a court order for parenting time, Sarah 'immediately' set a 'reasonable rights' parenting time schedule for Bridget." In fact, Bridget testified that Sarah purposely scheduled parenting time to conflict with her schedule, refused requests for additional days to coincide with her vacation time, and withheld AB for one month. During that long absence, Bridget asserted, Sarah interfered with her FaceTime conversations with AB. However, the remainder of the court's findings related to factor (j) were a fair resolution of conflicting evidence presented by the parties. We may not interfere with the court's assessment in that regard. See *Sinicropi v Mazurek*, 273 Mich App 149, 155; 729 NW2d 256 (2006).

Finally, Bridget challenges the court's factual findings related to factor (k), domestic violence. The court acknowledged that "Sarah slapp[ed] Bridget during an emotional exchange." But the court minimized that act as "angry exchanges appear to have been commonplace between the parties, with Bridget being the aggressor." The court continued by describing evidence of Bridget's verbal aggression toward Sarah in front of AB. The parties' tales of aggression conflicted, but Sarah presented text messages (and Bridget presented a video) both supporting Sarah's version of events. In any event, we may not interfere with the court's assessment of the parties' credibility in this regard, either.

Given the circuit court's improper reliance on Bridget's relationship with a married woman and its bias against Bridget's role as a working parent, we cannot hold that the court acted within its discretion in awarding sole physical custody to Sarah with such limited parenting time to Bridget. Further proceedings with up-to-date information will be required to consider the custodial arrangement that best serves AB's best interests.

## V. LEGAL CUSTODY

On this record, it also appears that the circuit court abused its discretion in awarding sole legal custody to Sarah. Pursuant to MCL 722.26a(1)(b), in determining whether joint legal custody is in the best interest of the child, the court must consider "[w]hether the parents will be able to cooperate and generally agree concerning important decisions affecting the welfare of the child." As stated in *Fisher v Fisher*, 118 Mich App 227, 232-233; 324 NW2d 582 (1982):

> In order for joint custody to work, parents must be able to agree with each other on basic issues in child rearing—including health care, religion, education, day to day decision-making and discipline—and they must be willing to cooperate with each other in joint decision-making. If two equally capable parents whose marriage relationship has irreconcilably broken down are unable to cooperate and to agree generally concerning important decisions affecting the welfare of their children, the court has no alternative but to determine which parent shall have sole custody of the children. [Citations omitted.]

There was no clear record indication that the parties could not agree on major decisions for AB. Sarah asserted that Bridget did not approve of her plan to baptize AB; Bridget's testimony showed only a desire for more information about Sarah's chosen church's stance on same-sex

marriage and the date of the ceremony. Sarah asserted that Bridget did not cooperate with potty training; however, it appears that Bridget simply handled potty training differently.

The larger concern in this case was the parties' ability and willingness to communicate. Evidence established that the parties' direct communications were not civil. Accordingly, the parties agreed to communicate about issues relevant to AB in a notebook. Sarah did believe this method was inadequate. However, it is not uncommon for the FOC to recommend or courts to order parents to use a computer program or notebook system to share information or to otherwise communicate. Through these indirect communication methods, parents can interact without danger of hostility, easing their ability to cooperate and agree on major issues. The incivility present in this case ran both ways. Under such circumstances, socially distancing parental interactions may be an appropriate method for maintaining a safe and efficient approach to shared parenting responsibilities.

On remand, the court must also reconsider its award of legal custody based on up-to-date information and must take into account alternative communication methods, if feasible.

We affirm in part the judgment of divorce but vacate the custody award and remand for further consideration consistent with this opinion. We do not retain jurisdiction.

/s/ Elizabeth L. Gleicher
/s/ Mark J. Cavanagh
/s/ Jane M. Beckering